[Cite as *State v. Cornelious*, 2026-Ohio-151.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio

    Appellee

v.

DeArryl Cornelious

    Appellant

Court of Appeals No. {48}L-24-1057

Trial Court No. CR0202202553

**<u>DECISION AND JUDGMENT</u>**

Decided: January 16, 2026

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and,
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Adam H. Houser, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Following a jury trial, defendant-appellant, DeArryl Cornelious, appeals the

February 21, 2024 judgment of the Lucas County Court of Common Pleas, convicting

him of aggravated murder, attempted aggravated murder, felonious assault, discharge of a

firearm on a prohibited premises, and gang participation, along with attached

specifications. For the following reasons, we affirm, in part, and reverse, in part.

## I. Background

{¶ 2} On February 12, 2022, ten-year-old D.E. was shot and killed while she and her eight-year-old brother, X.E., were passengers in a vehicle driven by their uncle, K.W. K.W. was also shot, but survived. X.E. was not physically harmed.

{¶ 3} Cornelious was indicted on the following charges in connection with the incident: aggravated murder, a violation of R.C. 2903.01(C) and (G), an unclassified felony (Count 1); attempt to commit aggravated murder, a violation of R.C. 2923.02(A) and (G), a first-degree felony (Count 2); two counts of felonious assault, violations of R.C. 2903.11(A)(2) and (D), second-degree felonies (Counts 3 and 4); discharge of a firearm on or near a prohibited premises, a violation of R.C. 2923.162(A)(3) and (C)(4), a first-degree felony (Count 5); and participating in a criminal gang, a violation of R.C. 2923.420(A) and (B), a second-degree felony (Count 6). Counts 1 through 4 carried with them firearm specifications under R.C. 2941.145(A), (B), (C), and (F); specifications for discharging a firearm from a motor vehicle under R.C. 2941.146(A), (B), and (D); and criminal-gang specifications under R.C. 2941.142.

{¶ 4} Cornelious's cousin, Byron Cleveland, was also indicted in this case on all the same charges. Cleveland entered an *Alford* plea to the amended charge of involuntary manslaughter, with an accompanying firearm specification, and was sentenced to a minimum stated prison term of 11 years and a maximum term of 16 and one-half years, with an additional three years on the firearm specification.

{¶ 5} Another of Cornelious's cousins, Carmanetta Wilson, was also charged in the same indictment with two counts of obstructing justice. She entered a plea of no

2.

contest to one count of obstructing justice and was sentenced to a prison term of 30 months.

{¶ 6} The charges against Cornelious were tried to a jury beginning January 29, 2024.

### A.  Occupants of a black Dodge Charger fire shots at K.W.'s vehicle.

{¶ 7} According to the evidence presented by the State, on February 12, 2022, K.W. picked up his ten-year-old niece, D.E., and eight-year-old nephew, X.E., from Woodruff Village apartment complex.  At approximately 12:43 p.m., driving his black Mercedes SUV, K.W. left the parking lot of Woodruff Village and headed north on Franklin Street.  Apparently unbeknownst to K.W., his vehicle was followed by a black Dodge Charger with tinted windows.

{¶ 8} Cameras at various points show the route K.W. took.  He drove west on Bancroft Street, then turned northwest onto Ashland, which becomes Collingwood Avenue.  All the while, he was being followed by the black Charger, which was accelerating to catch up.  The black Charger caught up to K.W.'s vehicle near the corner of Collingwood and Delaware and its occupants shot at the Mercedes SUV, causing it to crash into a bus shelter.  Video surveillance from Black Kite Coffee Shop recorded the crash and showed the Charger racing away.  K.W. was shot numerous times; D.E. was shot once.  That single shot proved fatal to D.E., but K.W. survived.

{¶ 9} X.E. was frantic, but was not physically harmed.  He told investigators that he had seen the black Charger when he was sitting alone in his uncle's vehicle in the Woodruff Village parking lot, waiting for K.W. and D.E. to be ready to go.  It was parked

3.

to the left of K.W.'s Mercedes. X.E. recalled that there was a dent in the front of the vehicle and the windows were tinted. He noticed the driver of the vehicle, who he described as a tall black male wearing white Air Force shoes, dark gray jeans, a red hoodie with the number "23" on it, and a ski mask with two dreadlocks sticking out of it. X.E. detected movement in the passenger seat, but did not see the passenger. He observed the same vehicle on Collingwood near Delaware. He saw the back window go down, then the front, and then the shooting began.

{¶ 10} Detective Nathan Kaczmarek testified that X.E. told him that when they were in the Woodruff Village parking lot, he saw his uncle argue with the man from the black Charger, but (1) this detail is not contained in the report Detective Kaczmarek prepared; and (2) X.E. testified at trial that K.W. had been talking to his aunt's boyfriend, not the driver of the Charger. Detective Kaczmarek also testified that after the shooting, someone approached him at the hospital and identified himself as X.E.'s grandfather. This man told Detective Kaczmarek that he had heard on the streets that the shooting was committed by a man with long dreadlocks and yellow skin who used to live in Moody Manor.

**B. The black Dodge Charger is located.**

{¶ 11} After establishing that the shots were fired from a black Dodge Charger with tinted windows, other law enforcement agencies were advised to be on the lookout for the vehicle. On February 19, 2022, a Lucas County Sheriff's Deputy attempted to initiate a stop of a black Dodge Charger in the McCord Road and Hill Avenue area. The driver fled and led the deputy on a chase to I-475. The driver abandoned the vehicle on

4.

the side of the expressway near Bancroft Street and fled on foot, but was caught. He was identified as Jalin Hand. Hand was ruled out as a shooting suspect because data from cell phone towers showed that he had not been in the vicinity of the crime scene.

{¶ 12} It was determined that the vehicle had been stolen from a car lot in Auburn, Indiana on December 21, 2021—two months before the shooting. The thieves were identified as brothers Deonte and Donzell Moore.[1] They, too, were ruled out as suspects.

{¶ 13} An inventory search of the black Charger was performed. There was a spent rifle casing recovered from the pocket of the right rear door. There was damage to the right side of the vehicle and minor brush damage on the left side. Parts of the vehicle, including the hood and rims, had been spraypainted silver; paint drips and over-spraying suggested that the paint job had been hastily performed. It was apparent that the inside of the vehicle had been wiped down—there was a rag and cleaning spray plus residue from the cleaning spray—but there were wrappers and other items collected from the vehicle and submitted for DNA testing.

{¶ 14} Detectives received information suggesting that the black Charger had been stored on Thurston Road. This was the home of B.H., a cousin of Byron Cleveland. Detectives were unable to determine whether the car had ever been there.

{¶ 15} Cleveland lived with his grandmother, S.W., on Pool Street. Detectives went to her home on March 10, 2022. S.W. consented to a search of the home, but Cleveland would not consent to a search of his bedroom, so a warrant was obtained.

---

[1] A broken fingernail found in the vehicle belonged to Deonte Moore, who had stolen the vehicle in Indiana.

5.

Police collected Cleveland's cellphone, which was found on the stairway, a pistol—not the same caliber as the murder weapon—and a sweatshirt that said "BU" and "Body Up." Body Up is a local Bloods gang. On the concrete in front of S.W.'s home, someone had carved "Body Up," "RIP Mario," and "RIP Ghost." Detectives know "RIP Ghost" to be a reference to Michael Patterson, a member of the Moody Manor Bloods gang who was murdered in 2021.

{¶ 16} During witness interviews, detectives were told that after the shooting, Cleveland and Cornelious went to S.W.'s home. They pulled video surveillance from one of S.W.'s neighbors on Pool Street to see if Cleveland had been there on February 12, 2022. The video shows that at approximately 3:20 p.m., a black Dodge Durango pulled up to the home. Cornelious emerged from the vehicle and tried going in the front door, but it was locked. Cleveland got out of the vehicle—as did the driver of the Durango, who has not been identified. Cleveland was able to climb into an upstairs window and let Cornelious in. They were picked up around 7:00 p.m. by someone driving a white SUV.

{¶ 17} When they arrived at the Pool Street home at 3:20 p.m., Cleveland was wearing a red top under a jacket. Cornelious was wearing gray jeans. Neither Cleveland nor Cornelious was wearing white Air Force shoes. Both were wearing different clothes when they left at 7:00 p.m. Cornelious is six feet, three inches tall. Cleveland is five feet, nine inches tall.

{¶ 18} Witnesses also told detectives that Cornelious and Cleveland went to Texas on February 19, 2022, after the black Charger was found. Boarding passes were discovered confirming that this was true. The Charger was found around 10:30 a.m.

6.

Cornelious and Cleveland's flight left at 7:15 p.m.  They returned to Toledo on March 22, 2022.

### C.  Detectives interview Cornelious.

{¶ 19} Detectives interviewed Cornelious on March 31, 2022.  Cornelious told an evolving story about his whereabouts on February 12, 2022, his connection to the black Charger, and his knowledge of the shooting.

{¶ 20} First, Cornelious said that he was never at or near Woodruff Village on February 12, 2022, he had no knowledge of or involvement in the shooting, and he had never been in the black Charger.  He said he stayed the night at his girlfriend's house in West Toledo, and when she went to work, he got dropped off at his house in North Toledo.  He denied going to Pool Street or being with Cleveland that day.

{¶ 21} Detectives asked for Cornelious's girlfriend's name.  Cornelious then said that he wasn't with his girlfriend, but was with another female.  When he was told that his phone showed that he was in the area of Woodruff Village, he claimed that he was in the area making drug deliveries, but was not at Woodruff Village.

{¶ 22} Next, Cornelious admitted a connection to the black Charger.  He said that he had been dropped off at his girlfriend's house in the Charger and was picked up the next morning in the Charger.  He admitted going to Woodruff Village.  He conceded that he "maybe" went to Pool Street that day, but would not say whether Cleveland was with him.

{¶ 23} Cornelious changed his story and told officers that he had possession of the Charger, he drove it to his girlfriend's house, then stayed the night there.  The next

7.

morning, he went to Woodruff Village to meet with friends, including his cousin, Carmanetta Wilson, who lived at Woodruff Village.

{¶ 24} Finally, Cornelious admitted that he drove the Charger out of the Woodruff Village parking lot with others in the vehicle. He claimed that he did not like what the other occupants were about to do, so he jumped out of the car and an unknown male moved to the driver's seat. He returned to Wilson's apartment. He said that he left his phone in the car. When asked how he got his phone back, he first claimed it was brought back to him. Later he said that he went to get his phone.

{¶ 25} Cornelious admitted that he went to Texas, but denied that he went with Cleveland. He claimed he went there with his girlfriend to visit his sick grandmother. Cornelious could not tell the detectives the nature of his grandmother's illness. He eventually admitted that Cleveland was also in Texas, but denied that they went to Texas together.

{¶ 26} Cornelious ended his interview by saying that everything he had told the police was a lie.

### D. Cell towers place Cornelious in the Charger and at the shooting scene.

{¶ 27} The black Charger had a navigation and entertainment system called Uconnect, which communicates with cell towers; AT&T was its network provider. This data was examined, as was the cell-tower data for Cornelious and Cleveland's cell phones. Verizon was the provider of Cornelious and Cleveland's service. Because the Uconnect system and the cell phones had different network providers, the coverage area for the providers' antennas was not identical. Moreover, the caveat to the examination of

8.

cell-tower data is that it cannot pinpoint the location of a phone, it cannot determine who is using it, and it evaluates only phone calls—not texts.

{¶ 28} First, the records from the Uconnect system showed a complete lack of activity of the Charger from 1:05 p.m. on February 12, 2022, to February 18, 2022. The shooting occurred at approximately 12:45 p.m. on February 12, 2022, and the black Charger was located on February 19, 2022. Cleveland's phone showed no activity between 10:04:16 a.m. and 1:39:48 p.m. on February 12, 2022.

{¶ 29} On the day of the shooting, the Charger and Cornelious and Cleveland's phones accessed the same cell tower at 620 Scott Street from 12:00:00 a.m. to 4:30:00 a.m. On both networks, this tower covers Woodruff Village. The towers accessed between 4:47:31 a.m. to 10:12:42 a.m. are consistent with Cornelious and the Charger being in the same geographic region, but not at Woodruff Village. From 10:03:54 to 10:25:31 a.m., the Charger and Cleveland's phone accessed the same cell tower at 620 Scott Street. From 11:00:57 to 11:42:26 a.m., and again from 12:00:59 to 12:43:30 p.m., the Charger and Cornelious's phone accessed the same cell tower at 620 Scott Street, which, as previously stated, encompasses Woodruff Village. At 12:48:43 p.m., the Charger continued to access the cell tower at 620 Scott Street. On the AT&T network, this tower encompasses both Woodruff Village and the intersection of the shooting. Again, the shooting occurred at approximately 12:45 p.m.

{¶ 30} Between 12:48:44 and 12:54:37 p.m., the Charger and Cornelious's phone accessed towers that would indicate that they were in close proximity to each other. And between 1:05:14 and 1:22:16 p.m., the Charger and Cornelious's phone accessed the

9.

same cell tower, located on North McCord Road. After that, from 1:39:48 to 5:17:02 p.m., Cleveland and Cornelious's phones accessed the same cell towers at 1325 Hazelwood and 60 East Foulkes Street. The cell towers on Hazelwood and E. Foulkes encompass Cleveland's grandmother's house on Pool Street.

{¶ 31} Woodruff Village residents had reported that the black Charger was connected to Wilson's apartment. Cornelious's phone activity showed that he and Wilson called each other in the minutes right before and right after the shooting. Cornelious called Wilson at 12:21, 12:27, and 12:31 p.m. Wilson called Cornelious at 12:34, 12:42, and 12:43 p.m. Cornelious called Wilson again at 12:49 p.m. Then Wilson called Cornelious again at 12:52 and 12:53. The State suggested that the black Charger had, in fact, left the Woodruff Village parking lot, and Wilson was keeping Cornelious apprised of K.W.'s movements as he got ready to leave Woodruff Village.

{¶ 32} In addition to the cell-tower evidence and Cornelious's admission that he had been in the vehicle, DNA evidence connected Cornelious to the black Charger. When the black Charger was processed, numerous items were collected from the vehicle and sent for testing and comparison by the Bureau of Criminal Investigations. Included among them was garbage found on the floor of the vehicle, including cigar and snack wrappers. Cornelious's DNA was found on a wrapper and on a plastic tie. The BCI lab director who testified at trial acknowledged that the presence of Cornelious's DNA on these items in the vehicle did not mean that Cornelious himself had been in the vehicle. Moreover, he recognized that it could not be determined when Cornelious's DNA had been deposited on those items.

10.

{¶ 33} Swabs were obtained from fixtures within the vehicle—door handles, gear shift, ignition, steering wheel. The swab from the gear shift revealed that an unknown female was the major contributor of that DNA; Cornelious was excluded as a major contributor of the DNA collected from the gear shift. The remainder of the swabs produced DNA profiles that were of insufficient quality for comparison.

{¶ 34} Finally, additional data was extracted from Cornelious's phone. It was discovered that images of K.W.'s crashed vehicle, K.W. on the ground beside the vehicle just after being shot, and D.E. being carried to the ambulance were shared in a group chat between Cornelious and several other people, including Cleveland. Those images had been streamed on social media, but police believed that it was significant that the images were shared in this group chat, which had been named "Ghst Gang," a reference to deceased gang member Michael Patterson.

**E. Detectives uncover a gang-related motive and link Cornelious to the gang.**

{¶ 35} Detective Nick Bocik, a member of the Toledo Police Gang Task Force, was acknowledged as an expert witness and testified at length about gang activity in Toledo, including how police identify gang participation, the dynamics between the local gangs, the markers of certain gangs, and the identities of several known gang members.

{¶ 36} Detective Bocik explained that the Toledo Police keep files on gangs and their members. Gang participation is determined in one of two ways: (1) self-identification—i.e., a person admits to being in a gang; or (2) the satisfaction of two of the following: social media postings suggesting gang membership, association with other gang members, participating in gang-related criminal activity, "gang-related paperwork,

11.

or diagrams." Gang membership may be demonstrated by tattoos, graffiti, the use of certain phrases, social media posts, lyrics and symbols used in music videos produced by gang members, and the wearing of gang colors. Gang members often pay tribute to deceased gang members, and they rally around these tributes. In addition to gang members, Toledo Police are often aware of people associated or affiliated with certain gangs. Detective Bocik emphasized that they do not label a person a gang member solely because he hangs out with gang members.

{¶ 37} By Detective Bocik's estimation, Toledo has 20 to 25 known gangs. Some of them identify as Bloods, some as Crips, and some as hybrids. Some initiate members by requiring them to "jump in"—i.e., be beaten. Some allow membership based on a connection like a family relationship or friendship. Some require the commission of an act of violence or willingness to defend the gang.

{¶ 38} Detective Bocik explained that some gangs have alliances, rivalries, and feuds. Feuds and rivalries are not determined along Bloods/Crips-lines. There may be feuds or rivalries even among gangs that identify as Bloods. Relevant to this case, the Body Up and Moody Manor Blood gangs have been in a long-standing feud with Smith Park Mafia, Ro Gang, Lawrence Blood Villains, Stickney 33, and most of the other local Bloods groups. Police can tell that a rivalry is active because the gangs will taunt each other on social media, they will perform and post music videos referencing the feud, and police will see a rash of crimes. In some situations, gang members will tag each other on social media or share or comment on news articles reporting crimes that they have committed.

12.

{¶ 39} "Body Up" signifies that this gang is always a "body up" on the opposition, meaning that they have killed more people than its rival gangs. This gang has existed for three or four years and has approximately 15 members. Its principal gang sign is to hold the ring finger down while leaving the index, pointer, and pinky fingers up. The index and pointer fingers represent the number "2" and the pinky finger represents the number "1." This signifies the 2100 block of Kent, where many members live. Moreover, "B" (Body) is the second letter in the alphabet, and "U" (Up) is the 21st letter, so the sign may symbolize this as well.

{¶ 40} Moody Manor Bloods have been around for about 20 years and have approximately 50 members. Moody Manor members also reside around Kent, at or near the Moody Manor apartment complex. Body Up and Moody Manor are closely affiliated. Members of these gangs use the phrase "on Kent" as an oath. They also pay tribute to Michael Patterson, aka Ghost.

{¶ 41} In Detective Bocik's experience, gangs commit a multitude of crimes for the good of the gang, including homicide, felonious assault, robbery, burglary, disorderly conduct, narcotics sales, and curfew and traffic violations. He explained that drugs are important to gangs because they provide quick and easy financing. Firearms are important to gangs because they are used for protection and to commit acts of violence.

{¶ 42} Detective Bocik discussed the importance of music videos to gangs. Through the performance and production of music videos, gangs brag, make threats, show off firearms or money, and taunt rivals. Several examples of music videos were played for the jury and admitted into evidence. In one video, performed by members of 13.

Ro gang, members of that gang show disrespect for Body Up and Moody Manor. In other videos posted online within months of the shooting, Cornelious—whose nickname is Bishop and whose Instagram handle is OfficialBUBishop—performs, displaying firearms, paying tribute to Ghost, singing lyrics referencing violence against "opps," featuring other documented members of Body Up, using the phrase "on Kent," depicting signs and symbols of the gang, and professing "I'm a Blood, I'm dropping five"—a number associated with Bloods because of its symbol, a five-point star. In other social media posts from Cornelious's accounts, he is wearing "RIP Ghost" clothing, makes threats against "opps," and includes the tag "#ghostgang."

{¶ 43} Both Detective Bocik and other Toledo Police had encounters with Cornelious in 2021, and 2022, when Cornelious was with other documented Body-Up members. Detective Bocik identified some of the members with whom Cornelious was seen and discussed some of their prior felony convictions (or adjudications of delinquency), including involuntary manslaughter, felonious assault, aggravated robbery, escape, gang participation, and improper handling of firearms. He testified that Cornelious has prior convictions (or adjudications of delinquency) of felonious assault and having weapons under disability, dated October 3, 2019, and August 12, 2022, respectively. Detective Bocik considered Cornelious as having self-identified his gang involvement in the previously-mentioned music video ("I'm a Blood, I'm dropping five") and in a record from juvenile court, acknowledging membership in Moody Manor or Kent Block. After his arrest in this case, Cornelious and Cleveland were recorded in the

14.

back of a patrol vehicle frequently using the phrase "on Kent." Detective Bocik did not know when Cornelious became a member of Body Up.

{¶ 44} According to Detective Bocik, sometimes gangs will target associates or affiliates of a rival gang, even if those individuals are not necessarily "members" of the gang. Sometimes "opps" (the gang's opposition) are misidentified and mistakenly murdered or assaulted. Detective Bocik explained that here, they believe K.W. was the intended target of this shooting because he associated with Lawrence Blood Villains, a gang comprised of members who live in the Lawrence Street area. K.W. had appeared in a video called "Day in the Life on the L." In that video, K.W. specifically disparaged Kent and Body Up, both verbally ("Fuck Kent," "Fuck Body Up") and by holding the Body-Up gang sign downward, a show of disrespect. K.W. has a tattoo that says "Forever 17," a tribute to Desmonte Kendall, a deceased member of Lawrence Blood Villains. Detective Bocik testified that a separate Lawrence Street shooting has been attributed to Body Up.

### F. One of the guns is recovered.

{¶ 45} In May of 2023, police obtained a warrant to search a home on Elliot Street that was occupied by several members of Body Up gang. They recovered nine firearms. It was determined that one of the firearms had been used in the February 12, 2022 shooting. While acknowledging that Cornelious was not found to be in possession of the gun and was not present when the house was searched, the State presented evidence that firearms often move from person to person within a group.

15.

## G. Cleveland takes the stand in Cornelious's defense.

{¶ 46} As summarized above, Cleveland entered an *Alford* plea in this case to the amended charge of involuntary manslaughter and an accompanying firearm specification and was ordered to serve 11 to 16 and one-half years on the involuntary-manslaughter conviction plus three years on the firearm specification. In a separate matter, he entered an *Alford* plea to an amended charge of involuntary manslaughter with a firearm specification, felonious assault, discharge of a firearm, and participation in a criminal gang. He was ordered to serve 11 to 16 and one-half years on the involuntary-manslaughter conviction, with an additional five years on the firearm specification; eight to 12 years on the felonious-assault conviction, 12 months on the discharge-of-a-firearm conviction; and eight to 12 years on the gang-participation conviction. The sentence for the gang-participation conviction was ordered to be served concurrently to the other sentences, which were ordered to be served consecutively to each other and to the sentence imposed in the present case.

{¶ 47} Although he had never said so before—he had actually refused to speak to detectives—Cleveland claimed that Cornelious was not involved in the February 12, 2022 shooting. He testified that he slept at Wilson's place, and Cornelious came over at some point. Cleveland saw K.W., who he did not like because he is affiliated with the Lawrence Blood Villains. He did not communicate or argue with K.W., but he decided they would kill him because Cleveland didn't like him. He said that he did not know that anyone else was in K.W.'s vehicle.

16.

{¶ 48} According to Cleveland, he, Cornelious, and others he refused to name, left the Woodruff Village parking lot and drove to the next parking lot over. They discussed what was about to happen, and Cornelious exited the car because he did not want anything to do with it. Cleveland got in the driver's seat. Cleveland said that he did not know where Cornelious went, but Cornelious left his phone in the car. He claimed that his own phone was dead. Cleveland did not remember who, if anyone, he called using Cornelious's phone.

{¶ 49} Once Cornelious was out of the vehicle, Cleveland followed K.W., then they shot him at Collingwood. Cleveland testified that he did not know who did the shooting, he did not see the guns, and he did not know what happened to the guns after the shooting.

{¶ 50} After the shooting, Cleveland said he drove "Out Hill"—which he described as being the Dorr Street, Reynolds Road, and Holland-Sylvania area—and put the Charger in a garage. Cornelious was then dropped off at an apartment complex out that way. Cleveland said that he did not know how Cornelious knew to meet him there. Cleveland claimed that he and Cornelious next went to his grandmother's house so that he could change clothes. He maintained that he had been wearing a red Nike hoodie, jeans, and a Shisty ski mask. Cleveland believed they may have taken an Uber to his grandmother's house, but he did not know whose phone was used to call the Uber. Cleveland lost his keys, so when they got to the house, he went in the window. He testified that he changed clothes and they left. He could not remember if Cornelious changed. They then went their separate ways.

17.

{¶ 51} The next week, Cleveland left for Texas for a "vacation" and "to get out of the city." He admitted that Cornelious was with him, but said that he did not know why Cornelious went with him to Texas. He said Cornelious probably wanted to see his granny. Cleveland insisted that the flights were booked before Hand got caught with the Charger. He also denied knowing how Hand came to be in possession of the Charger.

{¶ 52} Cleveland admitted that because he was a co-defendant, he had all the State's evidence. He acknowledged that he saw Cornelious once at the jail, but denied that Body Up members persuaded him to testify and denied currently being in the gang. He maintained that he had been in Body Up for a couple of years, but denied that Cornelious was a member. Cleveland denied knowing whether the "BU" in "BUBishop" stands for Body Up.

{¶ 53} The State presented rebuttal witnesses and evidence showing that (1) Cleveland's mother had told him about the trial evidence; (2) he spoke with Cornelious at least six times while at the jail waiting to testify; (3) because of flooding at the jail and because of Cleveland and Cornelious's "keep separate" lists (explained below), Cleveland had been placed in a cell where he and Cornelious could shout to one another; and (4) Cleveland participated in three-way calls with Cornelious while at the jail—they would call the same person and the calls would be merged.

{¶ 54} Cleveland was cross-examined about some of the recordings of his jailhouse phone calls. In a January 30, 2024 phone call, in reference to testifying on Cornelious's behalf, he said: "Shit, I can't help him." But the next day, after being placed in a living area across the hall from Cornelious, he told his mother: "Tell

18.

[Cornelious's attorney] to call me to court so I can do this for bro." Cleveland and his mother engaged in the following recorded exchange:

> Cleveland's mother: I don't know what you're going to testify for him and say. You're about to fuck your appeal up.
>
> Cleveland: Just call [Cornelious's attorney].
>
> Cleveland's mother: You need to worry about yourself. He wasn't worried about you when he made his fucking statements that they said today.
>
> . . .
>
> Cleveland: Well, what did he even say?
>
> Cleveland's mother: He was in the car right before it happened and he got out of the car right before it happened because he didn't agree with what the people in the car were about to do. He didn't want to be involved in it.
>
> Cleveland: Just call him.

{¶ 55} Jail personnel testified about interactions between Cleveland and Cornelious. On January 29, 2024—the first day of trial—Cornelious was recorded telling Cleveland to call his (Cornelious's) lawyer. In a phone call on January 30, 2024, Cornelious's mother asked him if he had seen "his bro." Cornelious said yes. She also asked whether he was going to have Dot testify. "Dot" is Cleveland's nickname. Cornelious said yes. In another call from January 31, 2024, Cornelious spoke with a woman who remarked, "we just need Dot to go up there and do what the fuck he was supposed to do."

{¶ 56} Cleveland and Cornelious were supposed to have been kept separate while at the Lucas County Jail. The State presented evidence that it was a challenge to prevent interaction between them because Cleveland had six "keep separates" and Cornelious had 19.

30. "Keep separates" refers to the jail's practice of housing inmates away from other inmates who could pose a threat—in this case, rival gang members.

### H. The jury finds Cornelious guilty.

{¶ 57} The jury found Cornelious guilty of all counts. The trial court sentenced him to a term of life imprisonment with the eligibility of parole after 25 years as to Count 1, plus three years on the attached firearm specification, five years on the discharge-of-a-firearm-from-a-motor-vehicle ("drive-by") specification, and three years on the criminal-gang specification; a stated minimum prison term of ten years with a maximum indefinite prison term of 15 years as to Count 2, plus additional terms of three years, five years, and three years on the attached specifications; a stated minimum prison term of six years with a maximum indefinite prison term of nine years as to Count 4, plus additional terms of three years, five years, and three years on the attached specifications; a stated minimum prison term of five years with a maximum indefinite prison term of seven and one-half years as to Count 5; and a stated minimum prison term of five years with a maximum indefinite prison term of seven and one-half years as to Count 6. The court found that Counts 2 and 3 merged for purposes of sentencing. It ordered Cornelious's sentences for Counts 1, 2, 4, 5, and 6, to be served consecutively, as well as the firearm and drive-by specifications attached to those counts and the gang specification attached to Count 1. It ordered concurrent service of the gang specifications attached to Counts 2 and 4.

{¶ 58} Cornelious appealed. He assigns the following errors for our review:

> 1. Appellants Convictions Were Against the Manifest Weight of Evidence as There Was No Direct Evidence that Appellant was The One

Who Committed the Crime and The Jury Clearly Lost Its Way in Convicting Appellant.

a. It was Also Against the Manifest Weight of Evidence to Convict Appellant on a Complicity Theory of the Case.

2. There Was Not Sufficient Evidence to Convict Appellant of the Charges and Specifications and That (sic) the State's Case Was Based Upon Impermissible Inferences.

3. Appellate (sic) Received Ineffective Assistance of Counsel at the Trial Level that was Prejudicial to Him.

4. Appellant Was Denied a Fair Trial Through the Use of and Introduction of Prejudicial Other Bad Acts and Character Evidence that was Designed to Secure a Conviction through Impermissible Propensity Reasoning as to the Participating in the Criminal Gang and The Criminal Gang Specifications and it Was Plain Error for the Court to Allow Such Testimony In.

5. Appellant Was Denied His Right to a Fair Trial By Cumulative Error.

## II. Law and Analysis

{¶ 59} Cornelious challenges both the weight and sufficiency of the evidence. He argues that trial counsel was ineffective in multiple respects, and the trial court erred by admitting other-acts evidence. He also maintains that cumulative error prevented him from having a fair trial.

## A. Sufficiency and Manifest Weight of the Evidence

{¶ 60} In his first and second assignments of error, Cornelious argues that his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. His arguments in support of both assignments are similar, therefore, we will address them together.

{¶ 61} Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker,* 55 Ohio St.2d 208, 212 (1978). "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 2016-Ohio-8448, ¶ 13. Naturally, this requires "a review of the elements of the charged offense and a review of the state's evidence." *Id.*

{¶ 62} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387 . We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 2012-Ohio-6068, ¶ 15 (6th Dist.), citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist. 1983).

22.

{¶ 63} Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor.  *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.).  "The jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts."  *State v. Hill*, 2024-Ohio-2744, ¶ 24 (7th Dist.), citing *State v. Barnhart*, 2010-Ohio-3282, ¶ 42 (7th Dist.), citing *State v. Mastel*, 26 Ohio St.2d 170, 176 (1971).  "When there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which one is more credible."  *Id.,* citing *State v. Gore*, 131 Ohio App.3d 197, 201 (7th Dist. 1999).

{¶ 64} In addressing Cornelious's first and second assignments of error, we will discuss Counts 1 through 5 (the shooting-related convictions) together.  We will discuss Count 6 (the gang-participation conviction) separately.

### 1.  The Shooting-Related Convictions

{¶ 65} Under R.C. 2903.01(C), "[n]o person shall purposely cause the death of another who is under thirteen years of age at the time of the commission of the offense." Under R.C. 2923.02 and 2903.01(A), "[n]o person shall purposely, and with prior calculation and design," attempt to "cause the death of another[.]"  Under R.C. 2903.11(A)(2), "[n]o person shall knowingly . . . [c]ause or attempt to cause physical

23.

harm to another . . . by means of a deadly weapon[.]" And under R.C. 2923.162(A)(3), "[n]o person shall . . . [d]ischarge a firearm upon or over a public road or highway."

{¶ 66} Because Cornelious's precise role in the shooting was unknown—the State theorized that he was likely the driver of the vehicle—the State also proceeded under a complicity theory. Ohio's complicity statute, R.C. 2923.03(A), provides, in pertinent part that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall . . . aid or abet another in committing the offense." The Ohio Supreme Court explained in *State v. Johnson*, 93 Ohio St.3d 240 (2001), that "[t]o support a conviction for complicity by aiding and abetting . . ., the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *Id.* at syllabus. "[I]ntent may be inferred from the circumstances surrounding the crime." *Id.* A person who violates the complicity statute "shall be prosecuted and punished as if he were a principal offender." R.C. 2923.03(F).

{¶ 67} Cornelious challenges the identity and intent elements of the shooting-related convictions. He claims that he was not in the black Charger at the time of the shooting and that the State failed to prove the applicable mens rea for the offenses.

### a. Identity

{¶ 68} Cornelious claims that there was no evidence that he was in the car at the time of the shooting, that he was operating the vehicle, or that he fired shots at the car or the victims, and he complains that the State relied only on circumstantial evidence to support his conviction. Cornelious maintains that the only direct evidence in this case—

Cleveland's testimony and his police interview—made clear that he exited the vehicle before the shooting. He emphasizes that the State has no video evidence of when the vehicle left Woodruff Village apartments and no surveillance, physical evidence, or eyewitness testimony showing that he was in the vehicle when the victims were shot.

{¶ 69} As to the circumstantial evidence that was presented, Cornelious claims that his cell phone was not active at the time of the shooting—only Cleveland's was—and, in any event, cell-tower evidence is inexact. As to the DNA found on items recovered from the vehicle, he emphasizes that this does not mean that he was in the vehicle at the time of the shooting or that he was ever in the vehicle at all. He argues that "the jury made the inference that because [his] DNA was in the car and that [Cleveland's] cellphone was used in the Dodge Charger that [Cornelious] was the one who was involved in the shooting."

{¶ 70} The State responds that Cornelious provided a "constantly shifting account of events" that undermined his credibility; there was no real dispute that he occupied the Charger on the day of the shooting; X.E. saw someone next to the Charger who matched Cornelious's physical description; cell-tower evidence placed him in the same area as the Charger before the murder and with Cleveland soon after; he was seen on video with Cleveland after hiding the Charger; his flight to Texas evidenced consciousness of guilt; and there was motive to target K.W. because of his association with the Lawrence Blood Villains. The State emphasized that circumstantial evidence is afforded the same probative value as direct evidence.

25.

**{¶ 71}** Evidence is "direct" where "a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence." *State v. Cassano*, 2012-Ohio-4047, ¶ 13 (8th Dist.). "Circumstantial evidence is proof of certain facts and circumstances . . . from which the jury may infer other, connected facts, which usually and reasonably follow according to the common experience of mankind." *State v. Stringer,* 2013-Ohio-988, ¶ 31 (12th Dist.), citing *State v. Ortiz-Bajeca,* 2011-Ohio-3137 (12th Dist.). The Ohio Supreme Court has repeatedly recognized that circumstantial evidence has the same probative value as direct evidence. *State v. Franklin,* 62 Ohio St.3d 118, 124 (1991); *State v. Treesh,* 90 Ohio St.3d 460, 485 (2001); *State v. Martin*, 2017-Ohio-7556, ¶ 112. The identity of a perpetrator may be established by circumstantial evidence. *State v. Aekins*, 2023-Ohio-322, ¶ 79 (10th Dist.).

The State presented circumstantial evidence that Cornelious was in the vehicle at the time of the shooting. First, Cornelious admitted that he was driving the vehicle earlier that day and just before the shooting. Moreover, Cornelious's DNA was detected on wrappers found in the black Charger, suggesting that he had been in the car.

**{¶ 72}** Second, cell-tower evidence showed that Cornelious's movements matched the movements of the car from 11:42 a.m., when the car was at Woodruff Village, until 1:22 p.m., when the car was left in the area of McCord Road. Cornelious states that "the Co-Defendant's cell phone was active in the Dodge Charger" at the time of the shooting and "Appellant's phone was not[.]" Cornelious either misstates or misunderstands the record evidence. It was Cleveland's phone that was inactive; Cornelious's phone follows

26.

the path of the Charger, and it placed and received calls right before and right after the shooting.

{¶ 73} Third, Cornelious provided inconsistent, contradictory statements to detectives. His story evolved as he tried to explain away the State's evidence of his presence at the crime scene. Cornelious was left with only one way to distance himself from the shooting: to claim that he left his phone in the vehicle. This claim led to varying explanations for how he got his phone back and how Cleveland was able to contact Cornelious with his location when Cleveland's phone was supposedly dead and Cornelious's phone was allegedly in Cleveland's possession. Also, Cleveland seemed not to know that calls were made to and from the phone in the minutes just before and just after the shooting, suggesting that he was not telling the truth when he said that Cornelious's phone was left in the vehicle.

{¶ 74} Fourth, images of the victims were found on Cornelious's phone. While those videos were widely available to the public and were likely shared among people who were not involved in the shooting, the jury could reasonably infer that these images were shared between members of the "Ghst Gang" text group because of their involvement in the crime.

{¶ 75} Fifth, the State presented evidence that Cornelious fled the State after police located the vehicle involved in the shooting. *See, e.g., State v. Marshall*, 2008-Ohio-955, ¶ 57 (1st Dist.) (observing that defendant's credibility had been harmed by his flight after the crimes). Although Cornelious claimed that he went to Texas to visit his

27.

sick grandmother, the jury could have disbelieved this explanation for leaving the state, especially given that Cornelious could not describe his grandmother's supposed ailment.

{¶ 76} Sixth, one of the weapons used in the crime was found in the possession of Cornelious's known associates.

{¶ 77} Finally, Cornelious's pictures on social media, music videos, social media handles, and associations are consistent with his involvement in Body Up. Additionally, Cleveland testified that he disliked K.W. because of his association with Lawrence Blood Villains. This evidence supports the State's theory that this was a gang-related shooting arising from Body Up's rivalry with Lawrence Blood Villains.

{¶ 78} As to the direct evidence that was presented—i.e., Cornelious's statements to detectives and Cleveland's testimony—the jury was not required to believe Cornelious and Cleveland's version of events. In fact, there are many reasons why it may have chosen *not* to believe Cornelious and Cleveland.

{¶ 79} First, as previously mentioned, Cornelious gave numerous contradictory statements to detectives. As it became clear to Cornelious that (1) the Charger was captured in surveillance videos following K.W.s vehicle and driving away from the shooting, and (2) cell-tower evidence placed him in close proximity to the vehicle at all relevant times, his statement evolved to account for these facts. What's more, Cornelious had motive to be dishonest. The jury could have reasonably concluded that Cornelious was not credible.

{¶ 80} As for Cleveland's testimony, the jury may have been skeptical that Cleveland had not tried to exonerate Cornelious earlier. Moreover, Cleveland had an

28.

opportunity to invent his testimony, there were parts of Cleveland's story that did not match Cornelious's statement or the other evidence, and there were aspects of Cleveland's story that seemed improbable.

{¶ 81} Relating to Cleveland's opportunity to invent his testimony, recorded phone calls suggested that Cleveland did not believe that he could offer any testimony that would benefit Cornelious. It was only after being at the jail a couple of days—where he indisputably interacted with Cornelious and learned Cornelious's trial strategy from his mother—that Cleveland asked to be put in contact with Cornelious's lawyer.

{¶ 82} Parts of Cleveland's story did not match the other evidence. For instance, Cleveland claimed that when Cornelious exited the vehicle, he got in the driver's seat, but Cornelious said that he wasn't familiar with the person who moved to the driver's seat. Cleveland did not remember placing any calls from Cornelious's phone, but the evidence showed numerous calls to and from Wilson.

{¶ 83} Cleveland's story seemed improbable. He could not explain how Cornelious knew where to find him or how he was able to contact Cornelious given that Cleveland had his phone. Additionally, under Cleveland's version of events, Cornelious found a ride from Woodruff Village to the Dorr and Holland-Sylvania area, only to Uber back to Pool Street with Cleveland so that Cleveland could change clothes. Cleveland was unclear as to how they got to Pool Street—they may have taken an Uber—and he could not explain why he didn't just meet Cornelious at Pool Street instead of Cornelious twice driving across town. On top of all this, after the black Charger was found, Cornelious and Cleveland flew together to Texas, where they stayed for a month.

29.

{¶ 84} In sum, the State presented sufficient evidence that Cornelious was in the black Charger at the time of the shooting and either committed or was complicit in the commission of the offenses relating to the shooting. Additionally, the jury did not clearly lose its way when it rejected Cornelious and Cleveland's version of events, drew inferences adverse to Cornelious, and concluded that Cornelious was in the vehicle and involved in the shooting.

### b. Intent

{¶ 85} Cornelious also argues that the State did not show that he possessed the required mens rea for the shooting-related convictions. He claims that the State did not show that he "purposely" caused D.E.'s death and the injuries to K.W. He maintains that the State failed to prove that his specific intent was to kill or injure the victims. The State responds that the transferred-intent doctrine applies here.

{¶ 86} The mens rea for aggravated murder under R.C. 2903.01(C) is "purposely." Under R.C. 2901.22(A), "[a] person acts purposely when it is the person's specific intention to cause a certain result." The mens rea for felonious assault is "knowingly." Under R.C. 2901.33(B), "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature."

{¶ 87} "Ohio law recognizes that death and injuries are reasonably foreseeable consequences of firing shots into an occupied vehicle." *State v. Flow,* 2022-Ohio-4416, ¶ 82 (6th Dist.), citing *State v. Tuggle,* 2010-Ohio-4162, ¶ 110-111 (6th Dist.). Likewise, the Ohio Supreme Court has recognized that the act of firing multiple shots at victims

30.

evidences a purpose to kill. *See State v. Dean*, 2015-Ohio-4347, ¶ 140. This is true even where the defendant intended to kill someone other than the person that was killed. *Id.* at ¶ 136. This is known as "transferred intent," a doctrine "'firmly rooted in Ohio Law.'" *Id.*, quoting *State v. Sowell,* 39 Ohio St.3d 322, 332 (1988).

{¶ 88} Here, there was evidence that K.W. was the intended target of the shooting. Cleveland testified that while Cornelious was in the car, the occupants said, "[w]e about to shoot this n------." He confirmed that the plan was to murder K.W. The perpetrators monitored K.W.'s location, followed him, then shot repeatedly at his vehicle. Assuming that the jury believed that Cornelious remained in the car—its verdict indicates that it did—this evidence was sufficient to demonstrate Cornelious's intent. Moreover, the jury could reasonably infer from this evidence that Cornelious acted purposely and knowingly, regardless of the fact that K.W.—not D.E.—was the intended target. Given the evidence of the deliberateness of the conduct, we cannot say that the jury clearly lost its way when it concluded that Cornelious possessed the required mens rea for the shooting-related offenses, whether under a complicity theory or otherwise.

## 2. The Gang-Participation Conviction

{¶ 89} Under R.C. 2923.42(A), "[n]o person who actively participates in a criminal gang, with knowledge that the criminal gang engages in or has engaged in a pattern of criminal gang activity, shall purposely promote, further, or assist any criminal conduct, as defined in [R.C. 2923.41](C), or shall purposely commit or engage in any act that constitutes criminal conduct[.]" "Criminal conduct" is defined as follows under R.C. 2923.41(C):

[T]he commission of, an attempt to commit, a conspiracy to commit, complicity in the commission of, or solicitation, coercion, or intimidation of another to commit, attempt to commit, conspire to commit, or be in complicity in the commission of an offense listed in division (B)(1)(a), (b), or (c) of this section or an act that is committed by a juvenile and that would be an offense, an attempt to commit an offense, a conspiracy to commit an offense, complicity in the commission of, or solicitation, coercion, or intimidation of another to commit, attempt to commit, conspire to commit, or be in complicity in the commission of an offense listed in division (B)(1)(a), (b), or (c) of this section if committed by an adult.

{¶ 90} In sum, to prove participation in a criminal gang, the State must show "(1) the existence of a criminal gang, (2) appellant's active participation in the gang, (3) appellant's knowledge that the gang engages in or has engaged in a pattern of criminal gang activity, and (4) appellant's purposeful promotion, furtherance, or assistance of, or commission of or engagement in, any criminal conduct." *State v. Reese,* 2021-Ohio-3506, ¶ 44 (6th Dist.), citing *State v. Roberson*, 2017-Ohio-4339, ¶ 72 (6th Dist.).

{¶ 91} Cornelious insists that the State was unable to show that he was part of Body Up or that he or other alleged gang members had committed crimes in furtherance of the gang. Also, according to Cornelious, the detective could only state that he believes that Body Up Gang is a new gang and is an offset of the Moody Manor Boys or Bloods, suggesting that the State did not demonstrate the existence of the gang.

{¶ 92} The State responds that Bocik's testimony established that Body Up consists of three or more persons, explained its identifying signs and symbols, described generally the crimes committed by the gang, and provided evidence of specific crimes committed by Cornelious and other members. The State insists that Cornelious's active participation in the gang was established by his statements, depictions in social-media

32.

posts and music videos, his association with other gang members, and his role in the present shooting. And it maintains that his previous convictions and adjudications and the lyrics and visuals in his music videos evidenced the crimes he has committed in furtherance of the gang.

### a. Existence of a Criminal Gang

{¶ 93} As to the existence of the gang, R.C. 2923.41(A) defines "criminal gang" as "an ongoing formal or informal organization, association, or group of three or more persons to which all of the following apply":

(1)     It has as one of its primary activities the commission of one or more of the offenses listed in division (B) of this section.

(2)     It has a common name or one or more common, identifying signs, symbols, or colors.

(3)     The persons in the organization, association, or group individually or collectively engage in or have engaged in a pattern of criminal gang activity.

{¶ 94} The State presented the testimony of Detective Bocik, a member of Toledo Police's Gang Task Force. Detective Bocik testified that Body Up gang is three or four years old; there are approximately 15 identified members; the gang is allied with—even intertwined with—Moody Manor Bloods and they feud with most of the other local Bloods gangs, including the Lawrence Blood Villains; Body Up and Moody Manor Bloods' feud with other gangs had manifested in a surge of violent activity; members use a sign consisting of extending the index, middle, and pinky fingers up while holding the ring finger down; members primarily come from the Kent Street area; they use the phrase "On Kent" as an oath; the name "Body Up" means that the gang is a body up on its

33.

"opps" (i.e., they have killed more people than the opposition); and the gang pays tribute to Michael Patterson (aka "Ghost"), a deceased member of the closely-related Moody Manor Bloods.

{¶ 95} In addition to Bocik's testimony, videos were admitted into evidence where identified members of the gang displayed firearms and narcotics. Bocik testified that firearms are essential to the functioning of a gang and are often funded with money from drug trafficking. A sweatshirt with the words "Body Up" was found in Cleveland's room and "Body Up" was carved into the concrete in front of his home. Judgment entries of conviction and juvenile adjudications of delinquency were admitted into evidence, showing that Cornelious, Cleveland, and gang member Marquan Witiker, have had multiple convictions or adjudications for weapons violations and crimes of violence over the last five years. And Cornelious had been stopped in a vehicle with other confirmed members of Body Up, who had guns in the car and were charged with firearms violations. We find that this evidence was sufficient to show the existence of Body Up gang, and the jury did not lose its way in finding that this element of the offense was proven.

### b. Active Participation

{¶ 96} As to Cornelious's active participation in the gang, this element "requires the state to demonstrate that appellant actually—not just nominally—took part in the criminal gang." *State v. Smith,* 2017-Ohio-776, ¶ 38 (6th Dist.). Here, the State presented evidence that gangs use social media platforms and music videos to taunt, threaten, or brag about violent acts committed against their rivals and to show off money and firearms. Cornelious admitted in a music video that he is a Blood; during juvenile

34.

court proceedings, he self-identified as a member of Moody Manor Bloods and Kent Block, gangs that are closely-affiliated with Body Up; he performed in a music video with the lyric "I stand on business Body Up;" he and his associates (some of whom are confirmed Body Up members) maintain a group text chat called "Ghst Gang;" he uses the name *BU*Bishop as his social media handle; he wears clothing paying tribute to "Ghost;" he uses the phrase "On Kent;" Toledo Police have had encounters with Cornelious while he has been with known gang members who were charged with crimes; and he has performed in other music videos with lyrics and symbolism relating to his gang membership. This testimony was sufficient to prove Cornelious's active participation in a gang, and we cannot say that the jury lost its way in concluding that he was an active gang member.

### c. Knowledge that the Gang Engages in a Pattern of Criminal Gang Activity and Purposeful Promotion, Furtherance, Assistance, Commission, or Engagement in Criminal Conduct

{¶ 97} As to Cornelious's knowledge of a pattern of criminal activity and purposeful promotion, furtherance, assistance of, or commission of or engagement in any criminal conduct, Cornelious insists that Detective Bocik could not point to any specific crimes that he—or the other purported gang members whose criminal history was referenced—committed in furtherance of the gang other than the current charges. However, this court has recognized that these elements may be established by the same evidence the trier-of-fact relied on to conclude that the defendant committed the underlying felony that was tried along with the gang charge. *State v. Evans,* 2024-Ohio-5731, ¶ 62 (6th Dist.), citing *State v. Brown*, 2021-Ohio-4034, ¶ 61 (6th Dist.). Thus,

35.

Cornelious and Cleveland's participation in the subject offense is proper evidence that Cornelious knew that Body Up engages in a pattern of criminal activity and that he purposefully promoted, furthered, assisted, or committed criminal conduct. *See Reese,* 2021-Ohio-3506, at ¶ 64 (6th Dist.).

{¶ 98} Here, the State presented evidence that gang members must protect the gang, and if there's a feud, members become part of that feud. Cornelious rapped in a video: "I stand on business Body Up," indicating that he performs criminal acts for Body Up. Body Up was feuding with Lawrence Blood Villains, who K.W. associated with, and Cleveland—who admitted his membership in Body Up—testified that K.W. was targeted because of his association with Lawrence Blood Villains. Cornelious committed the shooting with his cousin, who entered an *Alford* plea in this case and was convicted of involuntary manslaughter and participation in Body Up gang in another case where he entered an *Alford* plea.

{¶ 99} The State also presented evidence that Cornelious, Cleveland, and gang member Marquan Witiker, have had multiple convictions or adjudications for weapons violations and crimes of violence over the five years preceding the trial. It offered testimony indicating that Cornelious had been stopped in a vehicle with other identified Body Up members who had guns in the car and were charged with firearm violations.

{¶ 100} All this evidence was sufficient to prove that Cornelious knew that members of Body Up, individually or collectively, engage in a pattern of criminal gang activity and that Cornelious purposefully promoted, furthered, assisted, committed, or

36.

engaged in criminal conduct. We cannot say that the jury lost its way in finding that these elements had been proven.

{¶ 101} Finally, Cornelious observes that Detective Bocik referenced a report from the juvenile court indicating that he self-identified as a member of Moody Manor Bloods or Kent Block gang, but he complains that that report was never entered into evidence. He also contends that in seeking to show that Cornelious had contacts with known gang members, the detective did not lay any foundation or provide a time frame for those individuals' association with a gang. We address below Cornelious's challenges concerning the report and the foundation for Bocik's testimony. As to the time frame, the State presented evidence that Body Up gang has been around for three or four years, and Bocik spoke about incidents and convictions that occurred within that time frame.

{¶ 102} We find Cornelious's first and second assignments of error not well-taken.

### B. Ineffective Assistance

{¶ 103} In his third assignment of error, Cornelious argues that he was prejudiced by the deficient performance of his trial counsel. In order to prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *State v. Shuttlesworth*, 104 Ohio App.3d 281, 287 (7th Dist. 1995). To establish ineffective assistance of counsel, an appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v.*

37.

*Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sanders*, 94 Ohio St.3d 150, 151 (2002).

{¶ 104} Properly licensed Ohio lawyers are presumed competent. *State v. Banks,* 2002-Ohio-4858, ¶ 16 (9th Dist.). To establish ineffective assistance of counsel, the defendant must show that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *Strickland* at 688-692. As recognized in *Strickland,* there are "countless ways to provide effective assistance in any given case." *Id.* at 689. "Judicial scrutiny of counsel's performance must be highly deferential." *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989), quoting *Strickland* at 689.

{¶ 105} Moreover, in matters involving trial strategy, "courts will generally defer to the judgment of trial counsel, even where 'another and better strategy' might have been available." *State v. Newsome*, 2005-Ohio-3775, ¶ 8 (11th Dist.), quoting *State v. Clayton*, 62 Ohio St.2d 45, 49 (1980). "A court will only consider reversing on these grounds where the choice of trial strategy so deviates from the standard of reasonableness 'that ordinary trial counsel would scoff at hearing of it.'" *Id.,* quoting *State v. Burgins*, 44 Ohio App.3d 158, 160 (4th Dist. 1988).

### a. Failure to Object to Bocik's Testimony

{¶ 106} Cornelious argues that trial counsel was ineffective for failing to object to Detective Nicholas Bocik's expert testimony regarding criminal gangs. He acknowledges that the State provided Bocik's CV and provided "a generic police report detailing

38.

generic gang activities," but he claims that the State failed to comply with the Crim.R. 16 disclosure requirements by (1) failing to disclose that he would be offering expert opinions, (2) failing to disclose the substance of those opinions, (3) failing to cite studies and scientific research underlying his expert opinions, (4) exceeding the scope of the information contained in his report, and (5) failing to produce juvenile-court records to support his testimony that Cornelious self-admitted gang membership. Cornelious maintains that the undisclosed expert opinions of Detective Bocik led to his conviction of Count 6.

{¶ 107} The State responds that Bocik was disclosed as a witness, and Crim.R. 16(K) does not require that a witness list include any special designation that an individual will be providing expert opinions. It points out that Bocik's CV was provided to Cornelious, which should have alerted him to the fact that Bocik would be testifying as an expert witness. The State claims that the purpose of providing an expert report is to prevent unfair surprise, and here, documents were disclosed during discovery, including a 2018 to 2023 timeline from Detective Bocik, police reports for 2018 to 2023, "gang materials," and "email correspondence with attachments." The State maintains that because these discovery disclosures are not in the record, Cornelious cannot show that Bocik's testimony exceeded the scope of the disclosures. Finally, the State contends that defense counsel made the strategic decision not seek to introduce the juvenile-court records documenting Cornelious's self-admission as a gang member. It points out that it produced "D. Cornelious YTC [Youth Treatment Center] records"—which themselves

39.

are not contained in the record—and defense counsel's decision not to insist upon the introduction of these records was a strategic choice.

{¶ 108} Crim.R. 16(I) requires the parties to provide each other with a witness list. There is no requirement that experts whose names are included in the witness list be designated as such. However, under Crim.R. 16(K), expert witnesses must "prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications." The written report and summary of qualifications must be disclosed to opposing counsel no later than 21 days before trial. "Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial." *Id.* The exclusion of an expert's testimony when the report is not disclosed in accordance with Crim.R. 16(K) is mandatory. *State v. Boaston,* 2020-Ohio-1061, ¶ 55 ("The plain language of Crim.R. 16(K) expressly provides the consequence for failing to disclose an expert's report as required: 'Failure to disclose the written report to opposing counsel *shall* preclude the expert's testimony at trial.'") (Emphasis in original.).

{¶ 109} Here, Cornelious argues that his trial counsel was ineffective for failing to seek this remedy when the State allegedly failed to provide a written report containing Bocik's expert opinions on Cornelious's gang activity. We cannot address this argument, however, because it would require us to exceed the scope of our review on direct appeal.

{¶ 110} "In a direct criminal appeal, this court's review is limited to evidence presented at trial; we cannot consider matters outside the record before us." *Maumee v. Yeager,* 2024-Ohio-858, ¶ 72 (6th Dist.), citing *State v. Ishmail,* 54 Ohio St.2d 402

40.

(1978). "[A]rguments which are not supported by factual evidence in the record are merely speculative assertions, and speculation is not a sufficient basis for an appellate argument. *Id.,* citing *State v. Powell,* 2020-Ohio-3887, ¶ 37 (8th Dist.). Without being able to review the State's discovery responses, we cannot say whether the State failed to comply with Crim.R. 16(K) or if counsel was ineffective for failing to object to Bocik's expert testimony. While there may be other procedural vehicles through which Cornelious may make this argument, we must reject it in this direct appeal as it relies on evidence outside the record. *Yeager* at ¶ 72.

{¶ 111} As to Cornelious's YTC records, Bocik identified that these documents evidence Cornelious's self-admission of gang membership. These records were produced in discovery on February 13, 2023. It was not incumbent on the State to admit these documents into evidence. If Cornelious believed that Bocik misrepresented the contents of the documents, he could have used the documents on cross-examination to impeach Bocik's testimony. The decision not to do so was either strategic or was premised on the fact that the documents supported Bocik's testimony.

### b. Failure to Argue "Merger" of Gun Specifications

{¶ 112} Cornelious at first argued that counsel was ineffective for "failing to argue merger of the firearm specifications." After briefing in this matter was complete, we granted Cornelious's motion for leave to amend his brief to address case law that he overlooked, and we allowed the State to file a response. In his amended brief, Cornelious

41.

claims that he was sentenced to 29 years on specifications when the court was authorized to impose only ten years.[2]

{¶ 113} As an initial matter, the State points out that Cornelious's calculation of 29 years is wrong—he was ordered to serve a total of 27 years on the specifications. The State is correct. On Counts 1, 2, and 4, the trial court imposed terms of three years (for using a firearm, R.C. 2941.145, the "firearm specifications"), five years (for discharging a firearm from a motor vehicle, R.C. 2941.146, the "drive-by specifications"), and three years (for gang participation, R.C. 2941.142, the "gang specifications"). It ordered that all terms imposed on the specifications be served consecutively to one another and to the sentences imposed on the underlying offenses, except for the gang participation specifications on Counts 2 and 4, which it ordered to be served concurrently. As such, the total prison term imposed for the specifications was 27 years:

| Count | Firearm Spec. | Drive-By Spec. | Gang Spec. | Total |
|-------|---------------|----------------|------------|---------|
| 1 | 3 yrs. | 5 yrs. | 3 yrs. | 11 yrs. |
| 2 | 3 yrs. | 5 yrs. | concurrent | 8 yrs. |
| 4 | 3 yrs. | 5 yrs. | concurrent | 8 yrs. |
| | | | | 27 yrs. |

{¶ 114} Before reaching the substance of Cornelious's argument, we briefly address the jargon employed in his assignment of error. His assignment of error continues to claim that trial counsel was ineffective for "failing to argue merger of the gun specifications." He maintains that "merger" was required because "[t]he shooting of

---

[2] On page 6 of his Second Amended Brief, Cornelious claims that only five years could be imposed. On Page 7, he claims that only ten years could be imposed.

42.

the Dodge Charger (sic) and the victims all took place at the same time and it was the same firearm."

{¶ 115} The State responds that merger principles do not apply to specifications because they are penalty enhancements and not allied offenses of similar import. Again, the State is correct. "[F]irearm specifications are penalty enhancements, not offenses, therefore firearms specifications are not subject to merger with other offenses merely because they each involve the use of the same firearm." *State v. Thompson*, 2024-Ohio-2112, ¶ 34 (12th Dist.), citing *State v. Ford*, 2011-Ohio-765, ¶ 19. R.C. 2941.25, Ohio's codification of the judicial doctrine of merger, *State v. Washington,* 2013-Ohio-4982, ¶ 11, does not apply to specifications. *See State v. Martin,* 2021-Ohio-1615, ¶ 41 (6th Dist.).

{¶ 116} One more issue to address before reaching the substance of Cornelious's argument is the fact that as worded, his assignment of error still claims ineffective assistance of counsel for failing to argue that the specifications should "merge." Although he did not amend his assignment of error, he clarifies in his argument that "[w]hile [he] argued that it was ineffective assistance of counsel[,] it was actually plain error for the court to [s]entence [him] to 29 years (sic) consecutive for the gun specifications." We will give Cornelious the benefit of the doubt and consider the issue he now articulates. And because this issue was not raised in the trial court, he is correct that we review for plain error.

{¶ 117} Plain error is error that affects substantial rights. Crim.R. 52(B). To demonstrate plain error under Crim.R. 52(B), the party asserting error has the burden of

43.

demonstrating "that an error occurred, that the error was obvious, and that there is a reasonable probability that the error resulted in prejudice, meaning that the error affected the outcome of the trial." *State v. Echols*, 2024-Ohio-5088, ¶ 50, citing *State v. Knuff*, 2024-Ohio-902, ¶ 117. We will reverse for plain error "only in 'exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Bond,* 2022-Ohio-4150, ¶ 18, quoting *State v. Long*, 53 Ohio St.2d 91, (1978), paragraph three of the syllabus.

{¶ 118} Cornelious argues that under *State v. Beatty*, 2024-Ohio-5684, "only two of the gun specification[s] can be run consecutively and . . . the sentencing court can choose the most two (sic) serious gun specifications to run consecutively." He claims that the terms imposed for the other firearm specifications must be ordered to be served concurrently. Here, he argues, this means that two of the five-year gun specifications—the most serious gun specifications—could run consecutively and all others must run concurrently.

{¶ 119} The State responds that *Beatty* is of limited precedential value because it is a plurality opinion, and it argues that the case has no application to the drive-by-shooting and gang-participation specifications. The State also offers an interpretation of the relevant statute—R.C. 2929.14(B)—which Cornelious's brief omits.[3] Ultimately,

---

[3] Because Cornelious's brief omits any analysis of R.C. 2929.14(B), he fails to appreciate important distinctions between the two types of "gun" specifications at issue here—the specifications under R.C. 2941.145 for use of a firearm, to which R.C. 2929.14(B)(1)(a)(ii) applies, and the specifications under R.C. 2941.146 for discharging a firearm from a motor vehicle, to which R.C. 2929.14(B)(1)(c) applies. The forthcoming analysis will address the distinctions.

44.

however, the State concedes that "R.C. 2929.14(B)(1)(c)(iii) precludes more than one five-year specification for felonies committed as part of the 'same act or transaction.'" But it insists that the firearm specifications were properly ordered to be served consecutively.

{¶ 120} We address the rationale for the State's concession of error as to the prison terms imposed on the drive-by specifications. We then address the firearm specifications.

### i. Drive-by specification

{¶ 121} The trial court imposed consecutive five-year prison terms for the drive-by specifications attached to Counts 1, 2, and 4. R.C. 2929.14(B)(1)(c)(i) provides for the imposition of a five-year prison term for an offender convicted of "a felony that includes, as an essential element, purposely or knowingly causing or attempting to cause the death of or physical harm to another," where the offender "also is convicted of or pleads guilty to a specification of the type described in [R.C. 2941.146(A)]"—i.e., discharging a firearm from a motor vehicle.

{¶ 122} But R.C. 2929.14(B)(1)(c)(iii) prohibits the trial court from imposing more than one prison term under this section where the felonies were committed as part of the same act or transaction:

> A court shall not impose more than one additional prison term on an offender under division (B)(1)(c) of this section for felonies committed as part of the same act or transaction. If a court imposes an additional prison term on an offender under division (B)(1)(c) of this section relative to an offense, the court also shall impose a prison term under division (B)(1)(a) of this section relative to the same offense, provided the criteria specified in that division for imposing an additional prison term are satisfied relative to the offender and the offense.

45.

{¶ 123} Cornelious argues that all the charges here arose from a single act or transaction. The State appears to accept this assertion. So do we. *See State v. Lewis,* 2019-Ohio-3929, ¶ 48 (6th Dist.) (agreeing with cases that have found that multiple shots fired at rival gang members were the same transaction). We find that Counts 1, 2, and 4 were all committed as part of the same act or transaction. Because they were committed as part of the same act or transaction, only one five-year prison term was permitted for the drive-by specification. The trial court committed plain error when it imposed five-year terms on all three counts.

### ii. Firearm specification

{¶ 124} The trial court imposed consecutive three-year prison terms for the firearm specifications attached to Counts 1, 2, and 4. R.C. 2929.14(B)(1)(a)(ii) provides for the imposition of a three-year term for an offender who is convicted of a felony and also is convicted of a specification under R.C. 2941.145(A)—i.e., using a firearm to facilitate the offense. R.C. 2929.14(B)(1)(b) provides that "[e]xcept as provided in *division (B)(1)(g)* of this section, a court shall not impose more than one prison term on an offender under division (B)(1)(a) . . . for felonies committed as part of the same act or transaction." (Emphasis added.)

{¶ 125} R.C. 2929.14(B)(1)(g) provides as follows:

> If an offender is convicted of . . . two or more felonies, if one or more of those felonies are aggravated murder, murder, attempted aggravated murder, attempted murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of . . . a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, *the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section*

*for each of the two most serious specifications of which the offender is convicted . . .* and, *in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.* (Emphasis added.)

{¶ 126} This statute makes clear that for certain violent offenses involving two or more felonies that include firearm specifications, the trial court *must* impose prison terms for the two most serious firearm specifications and *may*—in its discretion—impose prison terms for any remaining specifications. In *State v. Beatty,* 2024-Ohio-5684, ¶ 10—a plurality decision—the Ohio Supreme Court characterized the prison terms that *must* be imposed as "mandatory prison terms," and the prison terms that *may* be imposed as discretionary or *not* "mandatory prison terms."[4] It went on to consider whether non-mandatory prison terms could be ordered to be served consecutively or whether concurrent service was required.

{¶ 127} The Court observed that under R.C. 2929.41(A), and except as provided in R.C. 2929.41(B), 2929.14(C), or 2971.03(D) or (E), a prison term must be served *concurrently* with any other prison term. It concluded that "the language of R.C. 2929.14(B)(1)(g) does not provide an exception to R.C. 2929.41(A) to allow discretionary prison terms for firearm specifications to run consecutively." *Id.* at ¶ 18. The Court then discussed possible exceptions to concurrent service contained in R.C. 2929.14(C).

---

[4] The dissenting opinion sharply disagreed with the lead opinion's interpretation of what constitutes a "mandatory prison term."

47.

{¶ 128} R.C. 2929.14(C)(1)(a) addresses consecutive service of terms imposed for firearm and drive-by specifications. It provides, in pertinent part, as follows:

> [I]f a mandatory prison term is imposed upon an offender pursuant to division (B)(1)(a) of this section for having a firearm on or about the offender's person or under the offender's control while committing a felony, if a mandatory prison term is imposed upon an offender pursuant to division (B)(1)(c) of this section for committing a felony specified in that division by discharging a firearm from a motor vehicle, or if both types of mandatory prison terms are imposed, the offender shall serve any mandatory prison term imposed under either division consecutively to any other mandatory prison term imposed under either division . . ., consecutively to and prior to any prison term imposed for the underlying felony pursuant to division (A), (B)(2), or (B)(3) of this section or any other section of the Revised Code, and consecutively to any other prison term or mandatory prison term previously or subsequently imposed upon the offender.

{¶ 129} The Court acknowledged that under R.C. 2929.14(C)(1) "if a court imposes a 'mandatory prison term' for a firearm specification, it must be served consecutively to any other 'mandatory prison term' imposed for the enumerated specifications and consecutively to the prison term for the underlying felony to which the specification is attached." *Id.* at ¶ 12. But it held that R.C. 2929.14(C)(1) does not permit consecutive service of *non*-mandatory prison terms imposed at the trial court's discretion. Because under R.C. 2929.14(B)(1)(g), prison terms were mandatory for only two of the firearm specifications, the Court found that consecutive service could not be ordered with respect to the *non*-mandatory prison terms imposed for the remaining firearm specifications.

48.

{¶ 130} The Court also considered whether consecutive service may be ordered under R.C. 2929.14(C)(4), which, under certain circumstances, permits consecutive service of multiple prison terms imposed for convictions of multiple "offenses." It concluded that R.C. 2929.14(C)(4) does not apply to permit consecutive service of multiple prison terms imposed for *specifications*.

{¶ 131} As we observed above, *Beatty* is a plurality decision. Moreover, only one of the justices who joined in this decision remains on the Court. Nevertheless, it is the most recent Ohio Supreme Court decision on point, and we will follow it unless or until new Ohio Supreme Court authority is released.

{¶ 132} Applying *Beatty* here, only two of the three three-year prison terms imposed for firearm specifications were "mandatory prison terms." As such, only two of those terms could be ordered to be served consecutively. Accordingly, the trial court erred when it ordered the third three-year term imposed for the firearm specification to be served consecutively.

### iii. Gang specification

{¶ 133} R.C. 2929.14(G) provides that "[i]f an offender who is convicted of . . . an offense of violence also is convicted of . . . a specification of the type described in [R.C.] 2941.142 . . . that charges the offender with having committed the felony while participating in a criminal gang, the court shall impose upon the offender an additional prison term of one, two, or three years." Here, the trial court imposed a prison term of three years as to the gang specifications attached to Counts 1, 2, and 4, but ordered consecutive service only as to the term attached to Count 1. The State maintains—and

49.

we agree—that neither *Beatty* nor any provision of R.C. 2929.14 impacts the gang specification.

### iv. Consecutive service of the surviving terms imposed for specifications

{¶ 134} To summarize, under R.C. 2929.14(B)(1)(a)(ii), (b), and (g), R.C. 2929.14(C)(1)(a), and *Beatty*, only two of the three-year terms imposed for using a firearm under R.C. 2941.145—not all three three-year terms—were properly ordered to be served consecutively. Under R.C. 2929.14(B)(1)(c)(i) and (iii), only one five-year term—not three five-year terms—was properly imposed for discharging a firearm from a motor vehicle under R.C. 2941.146. And only one of the prison terms imposed for the gang specifications was ordered to be served consecutively.

{¶ 135} R.C. 2929.14(B)(1)(c), (C)(1), and (G) contemplate consecutive service of prison terms imposed for firearm, drive-by, and gang specifications, subject to the limitations discussed above—i.e., that only one term may be imposed for a drive-by specification and only mandatory prison terms imposed for firearm specifications may be ordered to be served consecutively. That is because R.C. 2929.14(B)(1)(c) and (G) require the trial court to impose "additional," mandatory prison terms under these sections. Further, R.C. 2929.14(C)(1) specifically states that if mandatory prison terms are imposed under both (B)(1)(a), (c), or both, those mandatory prison terms shall be served consecutively to each other and to any other mandatory prison term.

{¶ 136} We, therefore, conclude that the aggregate prison term imposed for the specifications should have been 14 years—six years for two firearm specifications, five years for the drive-by specification, and three years for the gang specification. The trial

50.

court committed plain error when it imposed an aggregate prison term of 27 years on the specifications.

### c. Failure to Argue Against Competency of X.E.

{¶ 137} Cornelious argues that because X.E. was only eight years old when the shooting took place, trial counsel was ineffective for failing to question X.E.'s competence to testify. Cornelious maintains that trial counsel's failure to do so was prejudicial because there was no way of determining whether X.E.'s recollection was accurate.

{¶ 138} The State responds that a person who is ten years old or older is presumed competent to testify, and competence is determined at the time of trial—not when the incident occurred. It insists that even if a competency hearing had been requested, there is nothing in the record to suggest that X.E. was incapable of expressing himself or incapable of understanding his duty to tell the truth.

{¶ 139} Under R.C. 2317.01(A), "[a]ll persons are competent witnesses except those of unsound mind and children under ten years of age who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." But effective July 1, 2020, under Evid.R. 601(A), "[e]very person is competent to be a witness except as otherwise provided in these rules." Under either rule, the Ohio Supreme Court has held that a child who is ten years of age or older *at the time of trial* is competent to testify, even if the child was under the age of ten at the time of the incident in question. *State v. Clark,* 71 Ohio St.3d 466 (1994), paragraph one of the syllabus. The Court explained that "[w]hether or not the

51.

testimony of one over the age of ten concerning an event which occurred before the age of ten is accurate is a credibility issue to be resolved by the trier of fact" and is to be tested on cross-examination. *Id.* at 471.

{¶ 140} Because X.E. is presumed competent under R.C. 2317.01(A) and Evid.R. 601(A), X.E. was over the age of ten at the time of trial, trial counsel had the opportunity to cross-examine X.E., and X.E.'s credibility was ultimately an issue of fact for the jury, we find that trial counsel was not ineffective for failing to question X.E.'s competence.

### d. Failure to Object to Social-Media Evidence

{¶ 141} Cornelious argues that trial counsel was ineffective for failing to object to the admission into evidence of Facebook posts, social media posts, and YouTube videos. He claims that this social-media evidence was not authenticated, there was no testimony as to who posted the videos or how the videos were posted, and there was no underlying data to confirm that it was Cornelious who appeared in the social-media evidence.

{¶ 142} The State responds that Detective Duane Isabell testified about the extractions from Cornelious's phone and Bocik identified photos and videos of Cornelious, read photo captions, and explained the basis for his conclusion that the accounts belonged to Cornelious. The State insists that any objection by trial counsel would have been meritless.

{¶ 143} We agree with the State that between Detectives Isabell and Bocik, the social-media evidence was properly authenticated. In *State v. Gibson*, 2015-Ohio-1679, ¶ 47 (6th Dist.), we adopted an approach for authenticating social-media evidence. Under this approach, the proponent of the evidence need only present evidence upon which the

52.

jury may find that the evidence is what the proponent claims. The burden then shifts to the opponent of the evidence to present evidence raising questions as to the genuineness of the evidence.

{¶ 144} There is nothing in the record to suggest that the social-media evidence was not genuine. Accordingly, we cannot find that counsel was deficient for failing to object to the social-media evidence.

### e. Failure to Object to Gast Testimony

{¶ 145} Cornelious argues that trial counsel was ineffective for failing to object to the testimony of Jay Gast. Gast testified that there was a six-minute period between 12:43 and 12:49 p.m.—during which time the shooting occurred—when there was no activity on Cornelious's phone. He was asked, "if the individual using this device was in the process of committing a murder would it be surprising to you that you did not see cell phone activity in that six minutes?" Gast responded that he would not be surprised. Cornelious argues that trial counsel should have objected to Gast's testimony because it was "highly speculative and misleading" insofar as it implied to the jury that Cornelious's cell phone was not being used because he was committing the murder. He claims that the testimony should have been excluded under Evid.R. 403(A), and he insists that this testimony was prejudicial because it swayed the jury to convict.

{¶ 146} The State responds that the gap in cell-phone activity was supported by documentation and the follow-up question merely drew the jury's attention to the fact that a person is unlikely to be using a phone while committing a murder. It maintains that "[t]he question was nothing more than an effort to have the jury apply their common

53.

sense to the evidence and testimony provided." The State insists that counsel was not ineffective for failing to object and the failure to object did not prejudice Cornelious.

{¶ 147} That there was a six-minute period of inactivity on Cornelious's cell phone was a relevant fact, especially when considered in conjunction with (1) the cell-tower evidence placing Cornelious first near Woodruff Village and then near the scene of the shooting, and (2) the flurry of calls to and from Wilson just before and just after the shooting. The obvious inference the State wanted the jury to draw was that the pause in activity occurred while Cornelious was preoccupied with the shooting. Had the State in closing argument connected this fact (the absence of phone activity) with the inference it was asking the jury to draw (that Cornelious was preoccupied with the shooting), this would not have been objectionable. *See State v. Abdullahi,* 2024-Ohio-418, ¶ 28 (10th Dist.), citing *State v. Hunt*, 2013-Ohio-5326, ¶ 18 (10th Dist.) ("[P]rosecutors may draw reasonable inferences from the evidence at trial, commenting on those inferences during closing arguments.").

{¶ 148} The State's precise question to Gast—i.e., asking if it would "surprise" him that the perpetrator was not using his phone while committing the crime—was perhaps objectionable. However, we cannot say that the testimony elicited was "speculative," "misleading," "unfairly prejudicial," or "confusing." As such, if an objection had been lodged on one of these bases, we cannot say that it is reasonably likely that it would have been sustained. And because the inference to be drawn was reasonable based on the evidence, we also cannot say that the failure to object was prejudicial.

54.

{¶ 149} For all these reasons, we find Cornelious's third assignment of error well-taken, in part, and not well-taken, in part.

### C. Other Acts

{¶ 150} In his fourth assignment of error, Cornelious argues that the trial court erred when it allowed Bocik to testify about "how bad and vicious gangs are." He complains that Bocik was permitted to testify about other people's bad acts, intimating to the jury that it should find Cornelious "guilty by association." Cornelious also challenges Bocik's testimony about other gang members because the testimony was offered "without any foundation, certified court records or anything besides [Bocik's] statements." Cornelious concedes that this alleged error was not raised in the trial court, thus we may review his assignment only for plain error.

{¶ 151} "Evid.R. 404(B) 'prohibits evidence of a *defendant's* other acts' to preclude a factfinder from finding guilt by reasoning the defendant acted in accordance with his or her bad character or a proclivity toward criminality." (Emphasis in original.) *State v. Lathon,* 2024-Ohio-5886, ¶ 94 (10th Dist.), quoting *State v. Smith,* 2020-Ohio-4441, ¶ 36. But the evidence Cornelious complains about here is Bocik's testimony about other people. "Evid.R. 404(B) does not preclude evidence of *other people's* crimes, wrongs, or acts." (Emphasis added.) *Id.*

{¶ 152} Moreover, "other-acts evidence is admissible if it is relevant to prove an element of an offense." (Citations omitted.) *State v. Lathon* at ¶ 89. "[W]here the state use[s] the other-acts evidence to prove elements of the gang participation offense, Evid.R. 404(B) [does] not bar the admission of the other-acts evidence." *Id.*

55.

{¶ 153} Here, Cornelious argues only that evidence of others' bad acts should not have been admitted. Evid.R. 404(B) does not apply. And in any event, other-acts evidence was relevant to prove elements of the gang-participation offense. There was no plain error in the admission of this evidence.

{¶ 154} To the extent that Cornelious complains that the testimony was offered "without any foundation, certified court records or anything besides [Bocik's] statements," we disagree. The State laid a detailed foundation for Bocik's testimony. Bocik testified that he is a member of the Toledo Police Gang Task Force and is responsible for investigating gangs, providing gang intelligence, and suppressing gang activity. In this role, he has interviewed and arrested hundreds, if not thousands, of gang members and has spoken with families of gang members and citizens who live in communities with a heavy gang presence. Bocik explained that the task force keeps files on gangs and gang members. His office shares intelligence with other law enforcement departments and he routinely monitors gang activity in the area. Through this experience, Bocik has become familiar with signs, symbols, customs, and rivalries of area gangs. A proper foundation was laid for Bocik's testimony.

{¶ 155} As for Cornelious's claim that no certified court records were admitted to support Bocik's testimony, (1) some court records were admitted into evidence (Exhibits 196-199, 206-208); and (2) Cornelious has cited nothing to suggest that certified court records were required to be admitted to corroborate Bocik's testimony. The absence of corroborative court records did not render Bocik's testimony improper or inadmissible.

{¶ 156} We find Cornelious's fourth assignment of error not well-taken.

56.

## D. Cumulative Error

{¶ 157} Cornelious argues that numerous trial errors combined to make cumulative error. Under the doctrine of cumulative error, a judgment may be reversed when the cumulative effect of errors deprives a defendant of his or her constitutional rights, even though such errors are not prejudicial singly. *State v. Williams*, 2002-Ohio-4831, 36 (6th Dist.), citing *State v. DeMarco*, 31 Ohio St.3d 191, 196-197 (1987). For the cumulative error doctrine to apply, there must first be a finding that multiple errors were committed at trial. *State v. Moore*, 2019-Ohio-3705, ¶ 87 (6th Dist.), citing *State v. Madrigal*, 87 Ohio St.3d 378, 397 (2000). Then, there must be a finding that there is a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors. *Id.,* citing *State v. Moreland*, 50 Ohio St.3d 58, 69 (1990).

{¶ 158} Here, we have found no merit to Cornelious's claims of error other than his challenge to the imposition of prison terms for attached specifications. As such, we also find no cumulative error. We find Cornelious's fifth assignment of error not well-taken.

## III. Conclusion

{¶ 159} The State presented sufficient evidence to convict Cornelious of complicity for the shooting-related offenses and gang participation. His convictions were not against the manifest weight of the evidence. We find Cornelious's first and second assignments of error not well-taken.

57.

{¶ 160} Trial counsel was not ineffective for failing to object to Bocik's testimony, failing to challenge X.E.'s competency to testify, failing to object to social-media evidence, and failing to object to the State's cell-phone expert's testimony. However, only one five-year prison term should have been imposed for discharging a firearm from a motor vehicle—not three five-year terms. Only two of the three-year prison terms imposed for using a firearm—not all three three-year terms—were properly ordered to be served consecutively. The trial court committed plain error, and the aggregate prison term on the specifications should be reduced by 13 years. We find Cornelious's third assignment of error well-taken, in part, and not well-taken, in part.

{¶ 161} The trial court did not commit plain error when it admitted evidence of other bad acts of gangs, generally, and Cornelious's associates, specifically. We find his fourth assignment of error not well-taken.

{¶ 162} Finally, Cornelious was not deprived of a fair trial by the commission of multiple trial errors. We find Cornelious's fifth assignment of error not well-taken.

{¶ 163} We affirm, in part, and reverse, in part, the February 21, 2024 judgment of the Lucas County Court of Common Pleas. We exercise our authority under R.C. 2953.08(G)(2) to modify Cornelious's sentence. *See Lewis*, 2019-Ohio-3929, at ¶ 59 (6th Dist.). In accordance with that authority, we vacate the five-year prison terms imposed for the drive-by specifications attached to Counts 2 and 4, leaving one five-year prison term for the drive-by specification attached to Count 1. Further, we vacate the imposition of consecutive service of the prison term imposed for the three-year firearm specification

58.

attached to Count 4. Cornelious and the State are ordered to share the costs of this appeal under App.R. 24.

Judgment affirmed, in part,
reversed, in part, and vacated, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, P.J.

Christine E. Mayle, J.

Gene A. Zmuda, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.